Filed 5/18/22  P. v. Figueroa CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B299503 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA148473) |
| v. | |
| EMETERIO FIGUEROA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Following a bench trial, the trial court found Emeterio Figueroa guilty of the execution-style murder of developmentally-disabled Duke Herrera, who possessed the mental capacity of a 12-year-old. Figueroa lived in a riverbed homeless encampment, carried guns, abused substances, and was known to behave erratically. The murder occurred at night while Herrera was riding his bicycle home from a movie along the bank of the riverbed. In addition to murder (count 1), Figueroa was convicted of assault with a firearm on John Doe (count 2), and possession of a firearm (count 4). He raises a host of challenges on appeal, which we address seriatim.

Figueroa first argues that his jury trial waiver was not knowing and intelligent, but this contention is belied by the totality of circumstances, most notably the waiver colloquy between Figueroa and the prosecutor.

Figueroa next contends that the trial court erred in admitting dog scent evidence obtained from a shell casing near Herrera's body through use of a scent transfer unit device. However, Figueroa never raised an objection in the trial court to use of the scent transfer unit. This objection was forfeited. With respect to Figueroa's foundational objection to dog scent trailing evidence, the record adequately demonstrates the reliability of the dog trailing evidence, i.e., the dog handler was qualified, and the dog was sufficiently trained and reliable.

Figueroa claims the testimonial evidence from witnesses who lived with him in a riverbed was unreliable and significantly impeached. However, Figueroa made key admissions to some of these witnesses, including that he murdered Herrera to prove he could kill someone, and arranged with another to dispose of Herrera's bicycle and the murder weapon. The trial court

credited this testimonial evidence while observing that most of the riverbed encampment witnesses were Figueroa's friends and had no reason to lie. We are not at liberty to reweigh such evidence.

We also reject, for the reasons set forth above, Figueroa's contention that the trial court abused its discretion in denying his motion for a new trial based upon alleged evidentiary shortcomings.

However, the Attorney General concedes that, in light of recent ameliorative amendments to Penal Code[1] section 1170, subdivision (b), the matter must be remanded for the trial court to reconsider Figueroa's sentence on counts 2 and 4.

Accordingly, while we reverse and remand this matter for resentencing, in all other respects, we affirm.

## BACKGROUND

### A.    Factual Summary

On occasion, 24-year-old Herrera rode his black beach cruiser bicycle along the San Gabriel riverbed to and from the movie theater. The bicycle had a large, brown leather seat. Herrera had special needs and the mental capacity of a 12-year-old.

On September 18, 2015, Herrera left the movie theater at 7:52 p.m. The next morning, his body was found along the riverbed between Del Amo Boulevard and Carson Street.[2] He

---

[1] All unspecified statutory references are to the Penal Code.

[2] Ralph Santiago found Herrera's body while walking his dogs along the San Gabriel River Trail. He entered the trail near Monte Verde Park, and walked south, towards Carson Street. This court sua sponte takes judicial notice that Monte Verde

3

had been shot in the back of the neck, at close range, and the bullet had exited from his left eye. The gunshot wound and dirt marks near his knees and toes indicated that he had been shot from behind, while in a kneeling position. A nine-millimeter cartridge shell casing was found a few feet from his body. Neither his bicycle, the gun, nor the expended bullet was ever found.

Figueroa lived at the riverbed as part of a homeless encampment. He carried guns, including a .38 revolver, which he would brandish, and a sawed-off 12-gauge shotgun in a violin case. The mother of one of Figueroa's children would come to the riverbed and "switch guns out" with him.

In September 2015, Raymond Orozco lived at the riverbed and had known Figueroa for several years. On September 17, 2015, the night before the murder, Figueroa, Orozco, and Orozco's girlfriend, Samantha Torres, were at a skatepark near Caruthers Park. They smoked crystal meth, and Figueroa was "very high," drunk, and acting "crazy." While riding a red beach cruiser bicycle, Figueroa confronted five to seven males in a parked truck, brandished his revolver, and chased them. He then returned to approximately 20 feet away from Orozco and Torres and shot at a tree two to three times. Orozco left the park, and Torres urged Figueroa to leave. Orozco last saw Figueroa that evening around 10 minutes later, before 7:00 p.m., when he

---

Park is south of Del Amo Boulevard and that, accordingly, Herrera's body was found between Del Amo Boulevard and Carson Street. This court further takes judicial notice that the area along the riverbed between Del Amo Boulevard and Carson Street is approximately two to four miles south of Caruthers Park. (Evid. Code, § 452, subds. (g), (h).)

4

observed Figueroa leave his bicycle by a railroad track bridge near the 91 Freeway, south of the skatepark. Shortly thereafter, Torres went to a 7-Eleven store on Artesia Boulevard and observed Figueroa ride by on a bicycle belonging to another friend.

On December 29, 2015, Los Angeles County Sheriff's Department Detective Brandt House interviewed Torres. Early in the interview, Torres offered, "the only person that supposedly did it was [Figueroa]" and "I don't know if [Figueroa] killed that kid, but I'm pretty sure that he probably did." She also told Detective House that Figueroa "never admitted to anyone that he shot that kid." After Detective House advised Torres that if she were truthful with him, he would ensure that she was safe, she told him that Figueroa bragged that he "shot that kid for [the bicycle] seat" and because "he wanted to prove [to] himself that he could kill somebody." Figueroa also warned her that the police would be coming to the riverbed area because he shot a "kid" for his bicycle. At trial, Torres claimed she made up that Figueroa admitted to shooting Herrera because Detective House kept asking her the same questions, and she wanted to leave.

During a December 30, 2015 interview with Detective House, Orozco stated that a few nights after Herrera was shot, Figueroa warned him and Torres that the police would be coming around. Orozco could not remember if Figueroa said it was because the police thought Figueroa had something to do with Herrera being shot, because he "probably shot somebody," shot some guy, or because Figueroa shot at the people in the truck. Orozco told Detective House that he did not want to testify against Figueroa because he believed that Figueroa "would kill me and my family. I know that without a doubt in my mind."

5

Former riverbed resident Desiree Han resold bicycles as well as things Figueroa had stolen. Between August 17 and September 21, 2015, she was at a drug rehabilitation facility. Immediately thereafter, she stayed at her grandmother's house in Downey.

On May 19, 2016, Detective House interviewed riverbed resident Belinda Raymond. Raymond told him that approximately a week after the murder, Han told her that Figueroa rode a black beach cruiser with brown handlebars, grips, and a brown seat to her grandmother's house and left it and the gun there. Han told Raymond that she threw the gun over the freeway wall near her grandmother's house and buried it in the dirt. Raymond was not sure if Han was telling the truth because Han sometimes bragged or made things up.[3]

At trial, Raymond denied that Han told her Figueroa had murdered Herrera, stole his bicycle, or gave Han the gun used in the murder. She also testified that around the time of the murder, she used methamphetamines, which affected her memory. Han also denied having the conversation described by Raymond.

In October 2015, Figueroa was arrested for violating parole. He was charged with Herrera's murder a year later.

As described further below, on January 5, 2016, using a scent pad collected from the nine-millimeter cartridge found near Herrera's body, K-9 unit officer Roscoe trailed Figueroa's scent through the East Los Angeles Sheriff's Station. Roscoe led his handler, Michael Grossman, through the station and to the room

---

[3] According to riverbed resident Charles Price, Han embellished frequently.

where Figueroa sat and alerted Grossman that he had reached the end of the trail.[4]

## B.    Conviction and Sentencing

Following a five-day bench trial, Figueroa was convicted of the first degree murder of Herrera (§ 187, subd. (a); count 1), assault with a firearm on John Doe (§ 245, subd. (a)(2); count 2), and possession of firearm by a felon (§ 29800, subd. (a)(1); count 4).  As to the murder charge, the court also found true that Figueroa personally and intentionally discharged a firearm (§ 12022.53, subds. (b)-(d)) and that he personally used a firearm (§ 12022.5) in relation to the assault charge.[5]

In rendering its verdict, the court observed Torres's statement was "pretty clear" and the evidence that Figueroa admitted to the murder was "very strong."  The court also credited the "pretty detailed" and strong statement that Han received the bike and gun and buried the gun.  Further, it found

---

[4] The parties entered stipulations regarding DNA and shoe impression evidence.  A DNA sample taken from the victim's neck revealed a mixture consistent with at least two contributors: the victim was one, but Figueroa was excluded as the other.  DNA samples of a bloodstain were taken from shorts believed to belong to Figueroa.  The DNA profile matched Figueroa and excluded Herrera.  Also, four pairs of shoes and one single shoe that were believed to belong to Figueroa were compared to two shoe impressions found near the victim's body.  They did not match.  Figueroa also stipulated that he was a convicted felon.

[5] Figueroa had been charged with discharging a firearm with gross negligence (§ 246.3, subd. (a); count 3) based on his shooting at the tree.  The trial court found the evidence was not sufficient to support a finding of gross negligence.

Roscoe's conduct in trailing Figueroa persuasive corroboration of the witnesses' statements.  Although the court stated it was initially skeptical about the ability to use scent from the bullet casing, the testimony persuaded the court that was standard procedure.  The court also found Roscoe was trained in trailing, had a consistent trailing record, and never falsely identified a subject.

Figueroa was sentenced to a prison term of 25 years to life for the murder charge, plus a consecutive term of 25 years to life pursuant to the section 12022.53, subdivision (d) enhancement.  He was sentenced concurrently with a four-year prison term for the assault charge, plus a four-year term for the related gun enhancement, and a three-year term for the possession charge.

Figueroa filed a timely notice of appeal.

## DISCUSSION

### A.   Figueroa Voluntarily and Intelligently Waived His Right to a Jury Trial

#### 1.   *Relevant Proceedings*

On November 16, 2018, defense counsel informed the court that he and the prosecutor discussed a "possible court trial with Judge [Raul A.] Sahagun."[6]  At the court's request, the prosecutor then took Figueroa's jury waiver:

"[Prosecutor]:  Mr. Figueroa, you have a right to have a jury trial.  At that jury trial, you would have a right to have members of the community, so what would happen is we would have probably . . . 50 members of the community come in, your

---

[6] The record does not disclose whether Figueroa had prior conversations with his counsel about waiving his right to a jury.

attorney and I would ask them questions and select 12 jurors in order to preside over the trial. And what that means is that we would present evidence, your attorney would ask questions of the witnesses I call, you have the right to subpoena witnesses on your own and have them testify, and then the jury would decide whether you are guilty or not, and that standard is beyond a reasonable doubt.

"What we have discussed here in court is that we are going to not have a jury trial, and that means that Judge Sahagun is going to be the person who presides over your trial matter. Nothing changes as far as me subpoenaing in witnesses, your attorney being able to confront and cross-examine them with you being present, you being able to call your own witnesses and use the subpoena powers of the court. You also would have the right to remain silent or testify, you could testify if you wanted to, that's a right that's personal to you. The judge decides whether you are guilty beyond a reasonable doubt, the standard doesn't change from a jury trial for a court trial, but we are going to do that in front of Judge Sahagun and let Judge Sahagun listen to . . . all the evidence and make that decision beyond a reasonable doubt. Do you understand that?

"[Figueroa]: Yes.

"[Prosecutor]: Is it agreeable with you that we do a court trial in front of Judge Sahagun and that we waive a jury trial for both the charges against you and the priors, because you also have the right to have your priors heard in front of a jury as well, okay, so do you agree that we can try this case in front of Judge Sahagun and he would be the one in a court trial to decide whether you are guilty beyond a reasonable doubt as to the

charges and should you be convicted as to any priors that you may have?

"[Figueroa]: Yes."

After both defense counsel and the prosecutor joined, the court found Figueroa's waiver to be knowing, intelligent and voluntary.

 2. *Analysis*

"Under the federal Constitution and our state Constitution, a defendant in a criminal prosecution has a right to a jury trial. [Citations.] However, a 'jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel.' [Citation.] . . . '[A] defendant's waiver of the right to jury trial may not be accepted by the court unless it is knowing and intelligent, that is, " ' "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it," ' " as well as voluntary " ' "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." ' " ' [Citation.] '[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case.' [Citation.]" (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 166.)

A reviewing court must examine the totality of the circumstances to determine whether the waiver is knowing and intelligent. (*People v. Sivongxxay, supra,* 3 Cal.5th at p. 166.) A failure to obtain an informed waiver results in a complete denial of the defendant's right to a jury trial and is structural error. (*People v. Daniels* (2017) 3 Cal.5th 961, 1003 (lead opn. of Cuéllar, J.).)

10

The prosecutor advised Figueroa that he had a right to a jury trial and described the nature of that right, including that a jury would be comprised of 12 members of the community, that his counsel would participate in selecting the jurors, that the jury would hear evidence and decide his guilt or innocence, and that if his trial proceeded without a jury, a judge would hear evidence and decide his guilt or innocence. The prosecutor asked Figueroa if he understood, and Figueroa responded, "Yes." The prosecutor then asked whether Figueroa agreed to waive that right, and Figueroa responded, "Yes." These circumstances establish that Figueroa's waiver was knowing and intelligent.

Figueroa argues his jury waiver was not knowing or intelligent because he was not specifically advised that the 12 jurors would have to unanimously agree on his guilt or innocence. Our Supreme Court recommended that a defendant be advised that (1) a jury is made up of 12 members of the community; (2) a defendant through counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to reach a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his guilt or innocence. (*People v. Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) However, the court has "never insisted that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent." (*Id.* at p. 168.)

Figueroa next argues that the prosecutor's phraseology suggested others could waive his jury right and that a court trial was "an agreed upon eventuality." He points to the prosecutor's statements that "[w]hat we have discussed here in court is that *we are going to not have a jury trial*," and "*we are going to do that* in front of Judge Sahagun," and the prosecutor's question, "Is it

11

agreeable with you that . . . *we waive a jury trial* for both the charges against you and the priors[?]"  (Italics added.)

The prosecutor's statement, taken as a whole, does not lend itself to this argument.  The prosecutor's first words addressed to Figueroa were unequivocal: "*you* have a right to have a jury trial."  That the prosecutor asked for Figueroa's permission to waive a jury trial contradicts the notion that a bench trial was a fait accompli.  Any conceivable confusion caused by the word "agreeable" was alleviated by the prosecutor later asking, "do you agree."

Figueroa complains that the prosecutor's explanation of his jury right was "rambling" (in 28 lines of transcript) to such a degree that he could not understand it.  Figueroa observes, "not once was it simply stated to [Figueroa]: 'You have a constitutional right to a jury trial, do you give up that right?' "

Of course, obtaining a waiver from a defendant without explaining to him the *nature of* his jury right would not produce a knowing and intelligent waiver.  (See *People v. Daniels*, *supra*, 3 Cal.5th at p. 994 (lead opn. of Cuéllar, J.); *People v. Sivongxxay*, *supra*, 3 Cal.5th at p. 171.)  The prosecutor's advisement was not meandering, but followed a logical progression, and was not so long as to evade comprehension.  Indeed, at the end of the prosecutor's description of Figueroa's jury right, he asked Figueroa if he understood, and Figueroa responded, "Yes."  There is nothing in the record suggesting we should be skeptical of Figueroa's unequivocal affirmation.

## B.     The Trial Court Did Not Err in Admitting Dog Scent Evidence

Figueroa argues the trial court erred in admitting dog scent evidence without first holding a hearing pursuant to *People v.*

*Kelly* (1976) 17 Cal.3d 24 (*Kelly*) because the scent was collected using a novel device, a scent transfer unit (STU). He further argues the dog trailing evidence was altogether inadmissible because the prosecutor failed to make the requisite foundational showing articulated in *People v. Jackson* (2016) 1 Cal.5th 269 (*Jackson*).

      1.    *Factual Summary*

K-9 handler Grossman testified that at the time of trial, he had been a civilian contractor with the Los Angeles County Sheriff's Department for five to six years and had trained K-9 dogs for 16 years. His work included apprehension, narcotics detection, cadaver, and tracking and trailing.

Grossman began training Roscoe, a bloodhound, when Roscoe was eight weeks old. The pair were first certified in tracking and trailing[7] in 2012, when Roscoe was approximately two years old, and Roscoe had five or six certifications for "man trailing."

Grossman trained Roscoe not to move when there was a negative trail, i.e., no matching scent between the item that was presented to him and a trail. Roscoe had a 100 percent success rate for negatives and never identified the wrong person when doing a scent identification. Grossman documented Roscoe's training, scent identifications, and tracking and trailing (including failures) from November 1, 2010, to August 10, 2017, in an 89-page log that was admitted into evidence.

---

[7] To be certified for statewide deployment for tracking and trailing, a dog and handler team must be able to trail a minimum of 800 meters with three to five turns, and certifications must be completed every year.

13

In 2008, Grossman began using an STU, which is a vacuum machine that transfers scent from an object onto a gauze pad.[8] Grossman's regular practice in using the STU included double-sealing the scent pad in two "Ziploc" bags, which he then placed in a brown paper bag, and instructing the detective taking the evidence to put it in a glass jar at the station. Roscoe began working with STU-generated scent pads in 2011. Grossman observed that Roscoe did not behave differently when presented with an STU-generated scent pad than a scent collected in a different manner.

On September 19, 2015, using an STU, Grossman collected three gauze scent pads from the nine-millimeter casing found on the ground near Herrera's body.[9] One of the pads was kept in evidence at the sheriff's department.

Grossman's partner, Ann Anderson, has been a bloodhound handler since 2000. She was one of three bloodhound handlers in the United States certified by the Federal Bureau of Investigation in their human scent evidence team. She was also certified in trailing with her dog, Morgan, by the Ventura County Sheriff's Department, and at the time of trial, had been a contract bloodhound handler for the Los Angeles County Sheriff's

---

[8] Grossman testified that there is no state or industry standard for STU proficiency. A trainer at the Long Beach Police Department trained and certified Grossman in STU use. The training included sterilization, how to handle and process the evidence, how to not contaminate the source, and how to use the device. By 2012, he was "certified" to use the device.

[9] Before collecting the scent on September 19, 2015, Grossman sterilized the STU, wore latex gloves, and used sterilized tongs to pick up the casing and place it in the STU.

14

Department Homicide Division for approximately eight years. Anderson was trained to use an STU by the Bloodhound Handlers Coalition, and has used an STU hundreds of times. Her dogs have been able to track scents obtained from an STU. Anderson testified that she watched Grossman collect the scent from the shell casing on September 19, 2015, and that he did so in an appropriate manner.

On January 5, 2016, Roscoe and Grossman performed a scent trail at the East Los Angeles Sheriff's Station. Figueroa had never been to the station before and was not there when Roscoe arrived. Prior to Figueroa's arrival, Grossman presented the scent pad from the crime scene to Roscoe, who did not move, indicating that there was no trail to follow. Roscoe was returned to a car in the station's general public parking lot.

Thereafter, a sheriff's detective, Detective Adam Kirste, brought Figueroa into the station through the police entrance. He placed Figueroa in an interview room and sat with him. Grossman did not see Figueroa being brought in and was not told where Figueroa was located. Neither Grossman nor Roscoe had been to that sheriff's station before that day.

Grossman then brought Roscoe back into the station and presented the scent pad to him.[10] Roscoe made a right turn down a long hallway into a briefing room, came back out, and turned down another long hallway. The hallway had four doorways, with the doors cracked open a quarter inch. Roscoe sniffed the first door, passed it, went to the second door that was eight to 10

---

[10] Prior to trailing, Roscoe was presented with the other detectives who may have handled the scent pad so that he could dismiss them as possible trailing targets.

feet away from the first door, turned, went back to the first door, and pushed it open.  Detective Kirste, dressed in plain clothes, and Figueroa were in the room.  Roscoe sniffed Figueroa, continued past him, sniffed Detective Kirste, turned back to Figueroa, and indicated an alert on Figueroa by sitting down in front of him and alternating looks at Grossman and Figueroa.[11] Grossman's log indicates that Roscoe took about four minutes to work out the scent between the two doors.  During that time, he engaged in trying to pick up the scent in the air instead of on the ground.  Grossman testified that buildings have issues with air current moving around, "because of the vacuum effect going around doors [and] through air conditioning systems."

The defense presented Jill Kessler-Miller as a dog training expert.  At the time of trial, she had trained dogs for 31 years and was a certified trainer for two organizations, including the International Association of K-9 Professionals.  She trained dogs in several areas including obedience, agility, bite work, scent discrimination, scent detection of items such as drugs or bombs, and tracking, which she indicated was different from trailing.  She acknowledged that she has never testified as an expert in dog trailing, trained a dog in trailing, seen a trailing dog being trained, or seen a trailing dog work inside a building.  She reviewed 94 articles and research studies in preparation for her testimony.

Based on Kessler-Miller's review of the 89-page log, she concluded that, out of 71 searches, Roscoe had a success rate of

_____

[11] Anderson was present at the police station and helped run the procedure.  She did not observe Grossman do anything incorrectly.

54 percent and a fail rate of 22 percent. However, on cross-examination, she acknowledged that she did not know if all the entries pertained to Roscoe.

Kessler-Miller opined that Figueroa being dressed in "jail clothing" or that he was Hispanic could have improperly influenced Roscoe. She also questioned whether the scent of the metal shell casing could smell the same to Roscoe as Figueroa's metal handcuffs; whether Roscoe's "alert" on Figueroa was merely Roscoe looking for confirmation; and whether, if there were no discernable scent on the scent pad, Roscoe alerted on Figueroa simply because his was the newest or freshest scent at the station. She acknowledged she did not know whether Grossman gave Roscoe any improper cues and could not say whether Roscoe made an accurate identification. She also acknowledged that based on the way air moves indoors, it would have been normal for Roscoe to initially pass the first door and then return to it.

Defense counsel asked Kessler-Miller whether an STU device was reliable and a good means to preserve a scent. She testified, "it's a fine unit," and that the alcohol used to sterilize the unit does not "affect[ a dog's] search." However, she observed studies have determined that organic scents change over time, especially within the first three weeks.

2.    *Legal Principles Relating to the Admissibility of Dog Scent Evidence*

The case law regarding the admissibility of dog scent evidence is sparsely sprinkled over the last two decades. In 2003, this court held in *People v. Mitchell* (2003) 110 Cal.App.4th 772,

17

775, 789-794 (*Mitchell*), that a *Kelly*[12] hearing was required before dog scent identification evidence involving the use of an STU could be admitted into evidence because the STU was a novel device used in furtherance of a new technique, without "a history of use in the field of law enforcement or in any other arena." (*Mitchell*, *supra*, at pp. 787-789.) The court acknowledged, however, that " 'dog trailing is a lot different than dog scent recognition.' " (*Id.* at p. 790.)[13]

In 2016, the California Supreme Court in *Jackson*, *supra*, 1 Cal.5th 269, concluded a *Kelly* hearing was not required before admitting dog trailing evidence that did not involve the use of an STU. (*Jackson*, *supra*, at p. 316.) The court stated that "dog trailing . . . falls outside the scope of *Kelly* because it is not

---

[12] Under *Kelly*, when admission of expert testimony relating the use of novel scientific methods or techniques is at issue, the proponent of such evidence must sufficiently establish that the technique has gained general acceptance in its particular scientific field, the expert witness proffering testimony concerning the technique is qualified to do so, and correct scientific procedures were used. (*People v. Peterson* (2020) 10 Cal.5th 409, 444, citing *Kelly*, *supra*, 17 Cal.3d at p. 30.)

[13] In *Mitchell*, a dog handler used an STU to collect scents from shell casings, the victim's and defendant's shirts, and other items. A scent dog then participated in scent identification lineups, matching a scent pad that had, for example, scent extracted from a shell casing to a pad that contained scent collected from the defendant's shirt. (*Mitchell*, *supra*, 110 Cal.App.4th at p. 780.) *People v. Willis* (2004) 115 Cal.App.4th 379, relying on *Mitchell*, required a *Kelly* hearing before an STU-collected scent was used to see if a scent dog would " 'show[ ] interest' " in certain locations where the defendant lived or spent time. (*Willis*, *supra*, at p. 386.)

mechanized but rather the product of individual skill and innate physical ability. '[W]hile the reliability of a machine can be duplicated and passed down the assembly line with relative ease, the abilities and reliability of each dog desired to be used in court must be shown on an individual basis before evidence of that dog's efforts is admissible.' [Citation.]" (*Ibid*.) Additionally, unlike the sort of scientific evidence a juror might uncritically accept, for which a threshold *Kelly* hearing should be held, "[s]cent trailing evidence is not so foreign to everyday experience that it would be unusually difficult for jurors to evaluate." (*Jackson, supra*, at p. 317.) "Jurors are capable of understanding and evaluating testimony about a particular dog's sensory perceptions, its training, its reliability, the experience and technique of its handler, and its performance in scent trailing" in a given case. (*Ibid*.)

The *Jackson* court concluded that, in order for dog scent trailing evidence to be admitted, the proponent must demonstrate by a preponderance of the evidence four foundational factors: (1) the dog's handler was qualified by training and experience to use the dog; (2) the dog was adequately trained in tracking humans; (3) the dog had been found reliable in tracking humans; and, (4) the dog was placed on the track where circumstances indicated the guilty party to have been. (*Jackson, supra*, 1 Cal.5th at pp. 321-323.)

3. *Figueroa Forfeited His Argument that STU-collected Scent Evidence Required a* Kelly *Hearing*[14]

Figueroa contends the trial court erred in admitting dog scent evidence without first scrutinizing the STU pursuant to *Kelly*.[15] But he never raised such an argument in the court

------

[14] We note the court in Figueroa's case sat as the trier of fact without a jury, whereas "[t]he *Kelly* test is intended to forestall the *jury's* uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas* (1998) 18 Cal.4th 47, 80, italics added; see *People v. Peterson, supra*, 10 Cal.5th at p. 444 [the purpose of the *Kelly* test "is to protect against the risk of credulous *juries* attributing to evidence cloaked in scientific terminology an aura of infallibility" (italics added)]; cf. *People v. Diaz* (1992) 3 Cal.4th 495 [analyzing whether the defendant in a bench trial forfeited his *Kelly* objection by failing to raise it in the trial court]; *Seering v. Department of Social Services* (1987) 194 Cal.App.3d 298, 310 [finding "the purpose of the *Kelly* . . . rule will be served by applying it in" an administrative proceeding].)

[15] The People argue that the Supreme Court implicitly held that an STU is not subject to *Kelly* in *People v. Peterson, supra*, 10 Cal.5th at p. 446, because the court discussed the STU-collected scent and the non-STU-collected scent in *Jackson* without indicating the STU was a distinguishing factor. However, neither *Jackson* nor *Peterson* involved a timely objection to an STU-collected scent, and, thus, the court did not consider the propriety of admitting such evidence without a *Kelly* hearing. (See *Styne v. Stevens* (2001) 26 Cal.4th 42, 57, ["An opinion is not authority for a point not raised, considered, or resolved therein"]; *Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 797 [" ' "language contained in a judicial opinion is ' "to be understood in the light of the facts and issue

20

below.  Instead, Figueroa initially told the trial court that the dog scent trailing evidence should be excluded in its entirety because it failed to meet the *Kelly* test.  However, he later repudiated this position and agreed that, under *Jackson*, *Kelly* did not apply.  Figueroa never specifically argued, as he now advances on this appeal, that use of the STU is subject to *Kelly*.

Having failed to make a timely and specific objection in the trial court on the ground that he now urges on appeal, Figueroa forfeited this issue.  (See *Jackson*, *supra*, 1 Cal.5th at p. 366 [" 'A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal' "]; *People v. Bury* (1996) 41 Cal.App.4th 1194, 1201 ["A judgment shall not be reversed for the erroneous admission of evidence unless the evidence was timely objected to in the trial court on the exact ground being raised on appeal"]; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 414 [finding the defendant forfeited his *Kelly* challenge to the admission of evidence by failing to object in the trial court].)

Figueroa also cannot prevail on his alternative argument that counsel's failure to object to the use of the STU constituted ineffective assistance of counsel because, at a minimum, he cannot demonstrate the reasonable probability of a different outcome.  (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 414.)  Even putting to one side the dog scent evidence, substantial evidence supports Figueroa's murder conviction, as we discuss more fully *ante*.  Moreover, given the extensive use of STU devices since our decision in *Mitchell* 19 years ago, it is doubtful whether the STU

---

then before the court, and an opinion is not authority for a proposition not therein considered" ' " ' "].)

21

should still be considered a novel method for gathering scents for dog trailing.  (*See Jackson, supra*, 1 Cal.5th at p. 327.)  Roscoe began working with STU-generated scent pads in 2011 and did not behave any differently when presented with an STU-generated scent pad versus a scent collected in a different manner.  Anderson testified that she used STU-collected scents hundreds of times, and that her dogs effectively used STU-collected scents.  Defense expert Kessler-Miller, who reviewed 94 articles in preparation for her testimony, testified that the STU was "a fine unit" when asked about its reliability in preserving scent.  There is also abundant scientific literature with respect to the reliability of the STU.  (See, e.g., Caraballo et al., *An investigation into the concurrent collection of human scent and epithelial skin cells using a non-contact sampling device* in Forensic Sci. Int. (2016) vol. 266, pp. 148-159 ["the STU-100 was not suitable in collecting a sufficient amount of epithelial skin cells for DNA analysis, but proved to be efficient in collecting human scent from two different objects"]; Curran et al., *Canine human scent identifications with post-blast debris collected from improvised explosive devices* in Forensic Sci. Int. (2010) vol. 199, pp. 103-108 [using, in double-blind field trials to test the survivability of human scent on post-blast devices, an STU to collect scent and finding an average success rate of 82.2 percent]; Harvey & Harvey, *Reliability of Bloodhounds in Criminal Investigations* in J. Forensic Sci. (July 2003) vol. 48, no. 4, pp. 811-816 [using an STU to test bloodhound's trailing ability and finding the device "to be effective in the collection of scent without disturbing any other forensic evidence"].)

4.   *Substantial Evidence Supported the* Jackson *Factors for Admissibility*

Figueroa next argues that substantial evidence did not support any of the four *Jackson* factors for admissibility, including: (1) the dog's handler was qualified by training and experience to use the dog; (2) the dog was adequately trained in tracking humans; (3) the dog had been found reliable in tracking humans; and, (4) the dog was placed on the track where circumstances indicated the guilty party to have been.  (*Jackson*, *supra*, 1 Cal.5th at pp. 321-323 [discussing with approval four of the five factors for admissibility trailing evidence stated in *People v. Malgren* (1983) 139 Cal.App.3d 234, disapproved, in part, in *Jackson*, *supra*, at p. 323].)

" 'We review the trial court's conclusions regarding foundational facts for substantial evidence.  [Citation.]  We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " [Citation.]' [Citation.]" (*Jackson*, *supra*, 1 Cal.5th at pp. 320-321.)

With respect to the first factor, substantial evidence showed Grossman was qualified by training and experience to use Roscoe as a trailing dog.  He began training Roscoe when the dog was two months old, and the pair was certified in tracking and trailing in 2012.

With respect to the second and third factors, Roscoe was adequately trained in trailing humans and demonstrated reliability in doing so.  He was first certified in trailing when he was two years old and held an additional five or six certifications for man trailing.  Grossman regularly trained Roscoe, including

23

in negative trails, for which Roscoe had a 100 percent success rate. Roscoe never identified the wrong person when doing a scent identification. Grossman also recorded Roscoe's training, tracking, and trailing in an 89-page log that spanned November 2010 to August 2017.[16]

With respect to the fourth factor, substantial evidence established that Roscoe was placed on the track where circumstances indicated the guilty party to have been. Given the dirt patterns near Herrera's knees and toes, he was shot at the location where he was found. The scent pad was taken from a bullet shell casing that was found just a few feet from Herrera's body. A reasonable inference exists that the person who shot

---

[16] Figueroa raises several additional issues with respect to training and reliability that deserve only brief mention. Although Kessler-Miller opined that Roscoe had a 54 percent success rate, her analysis was impeached because it included entries for which Roscoe was not identified as the dog that performed the task listed. In any event, her conflicting testimony would go to the weight not the admissibility of the evidence. (See *People v. Merriman* (2014) 60 Cal.4th 1, 57 ["the reliability of a witness's testimony is a matter for the jury [or trier of fact] to decide and therefore concerns the weight of the evidence, and not its admissibility"].) Also, the fact that Grossman did not have as many years of experience or certifications and Roscoe did not have as much training as the handler and dog team in *People v. Peterson*, *supra*, 10 Cal.5th at pages 447 to 448, is inconsequential because nothing in *Peterson* suggests the qualifications described therein established a floor for adequate training and reliability.

Herrera touched that bullet casing.  (See *People v. Jackson*, *supra*, 1 Cal.5th at p. 322.)[17]

Having substantial evidence to support each of the *Jackson* factors, the trial court did not abuse its discretion in admitting the dog scent evidence.

## C.    Substantial Evidence Supports Figueroa's Conviction for Murder

"In addressing a claim of insufficient evidence to support a conviction, this court ' "reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from

---

[17] Figueroa argues the prosecution failed to demonstrate the reliability of a scent taken from a bullet casing after being fired from a gun and left in the dirt overnight.  He postulates the casing may not have come from the bullet that killed Herrera, the scent on the casing could have belonged to someone who touched it but did not fire the gun, and because the casing laid in the dirt overnight, "it is not a foregone conclusion that the only or primary scent on it would be that of the perpetrator of the homicide."  He also argues that Roscoe used the scent months after it was collected, and that there was no evidence that Roscoe had reliably trailed scents that were that old.  Whereas Figueroa's arguments question whether the scent was stale or contaminated, the *Jackson* court expressly rejected requiring such a showing for admissibility.  (*Jackson, supra*, 1 Cal.5th at p. 323 [stating the relevant question is not whether the scent is stale or contaminated, but whether the dog has a proven track record of reliably trailing scents only when there is a corresponding trail and even if other scents are present].)  Grossman testified that Roscoe had been trained on negative trails and had a 100 percent success rate in not trailing when there was no corresponding scent present.

25

which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.] 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*Jackson*, *supra*, 1 Cal.5th at p. 345.)

Statements from the riverbed residents that Figueroa admitted that he murdered Herrera and that he took Herrera's bicycle and the murder weapon to Han's grandmother's home constitute substantial evidence supporting his murder conviction. The dog trailing evidence corroborates these statements.[18]

---

[18] Figueroa argues that, even if the dog scent evidence was admissible under *Jackson*, it was unsound for the same reasons he argued it should not have been admitted. Because substantial evidence supports each of the four *Jackson* factors, we will only address Figueroa's additional arguments relating to the viability, staleness, or contamination of the scent. With respect to scent pad storage, Grossman testified that his standard practice was to tell law enforcement to store scent pads in a glass jar each time he collected a scent. Kessler-Miller agreed storing scent pads in glass was the correct procedure. Although Figueroa claims that the prosecution failed to demonstrate that human scent could survive on a bullet casing after being fired from a gun and laying on the ground overnight, Grossman's testimony implied that using scent from an expended casing was a regular and accepted practice. Neither Figueroa nor Kessler-Miller challenged this practice.

Although Figueroa observes that Roscoe stopped for approximately four minutes as he trailed the scent through the station trying to pick up the trail, both Grossman and Kessler-

Figueroa argues the riverbed residents' statements were "so fundamentally unreliable so as to present no 'solid value' and thus insufficient to support a conviction." He observes each riverbed witness was a methamphetamine addict who admitted to associated memory issues and provided muddled, contradictory statements to the authorities and at trial.

Notwithstanding Torres's conflicting testimony, the trial court found her original statement to Detective House credible and "very strong" evidence that Figueroa admitted he shot Herrera. It observed that virtually all the witnesses were Figueroa's friends and therefore had no reason to lie. The court also found the statement that Han received the bike and gun and buried the gun to be "pretty detailed" and strong. Han's testimony that she collected beach cruisers, resold bicycles, and sold things that Figueroa stole corroborates Raymond's story that Figueroa took the bicycle to Han.

Although Figueroa asks us to reweigh the evidence and independently determine that the witnesses' statements incriminating him were not credible, we are not at liberty to do so. "[It] is well settled that an appellate court will not reweigh the evidence, assess the credibility of witnesses or determine inconsistencies and contradictions in their testimony, these being

---

Miller testified that the movement of air currents indoors may affect a scent dog's trailing. Figueroa also points to Kessler-Miller's questions of whether Roscoe *could have* alerted on Figueroa because he was Hispanic, in jail clothing, or wearing metal handcuffs. However, it was for the court as the trier of fact to determine how much weight to give the four-minute delay and Kessler-Miller's opinions. (See *People v. Maury* (2003) 30 Cal.4th 342, 403; *People v. Sullivan* (1963) 214 Cal.App.2d 404, 408.)

matters for the trier of fact to resolve." (*People v. Sullivan*, *supra*, 214 Cal.App.2d at p. 408; see *People v. Maury*, *supra*, 30 Cal.4th at p. 403 ["Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)

Viewing the evidence in the light most favorable to the judgment, there was substantial evidence to support Figueroa's murder conviction.

## D. The Trial Court Did Not Abuse its Discretion in Denying Figueroa's Motion for a New Trial

On June 7, 2019, Figueroa filed a motion for a new trial on the bases that, inter alia, the verdict was contrary to evidence because the riverbed residents incriminating statements were so unreliable that they could not support the murder charge and the court erred as a matter of law in admitting the dog scent evidence. The trial court denied the motion.

Relevant here, section 1181 allows a trial court to grant a new trial when jury verdict "is contrary to law or evidence" (§ 1181, subd. (6)) or when it "has erred in the decision of any question of law arising during the course of the trial" (*id.*, subd. (5)). "A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised [its] discretion." (*People v. Davis* (1995) 10 Cal.4th 463, 524.) " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' [Citation.]" (*People v. Williams* (1988) 45 Cal.3d

28

1268, 1318; accord, *People v. Carter* (2005) 36 Cal.4th 1114, 1210; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127.)

We need not revisit Figueroa's argument that a new trial was warranted because the trial court erroneously admitted the dog scent evidence. As addressed above, substantial evidence supported each *Jackson* factor. Further, it was certainly not beyond the bounds of reason for the trial court to find the inculpatory statements of Torres, Orozco, and Raymond credible.

Figueroa argues that in ruling on his motion, the trial court relied on its erroneous recollection of facts to impute credibility to Raymond's statement. The trial court observed, "The one piece of evidence that I thought was significant, . . . Raymond describes . . . that Han told her she—[Figueroa] gave her the gun, gave her the bike, and she threw it over the fence at her grandmother's house and there was some construction back there so they didn't want to bury it. How would Raymond know to make that up? How would she know those facts if, indeed, there is a place behind the grandmother's house, there was construction going on over there. How would she make that up? And I think it's strong, strong evidence that she didn't make it up, that Han, indeed, told her . . . there is no other explanation for her making that statement other than that is what Han said."

Although Figueroa is correct that Raymond did not make any statement that there was construction behind Han's grandmother's house, the trial court's erroneous recollection of this specific evidence was harmless. (See Cal. Const., art. VI, § 13 ["[n]o judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has

29

resulted in a miscarriage of justice"]; *People v. Braxton* (2004) 34 Cal.4th 798, 818, 820 [error regarding new trial motion subject to "miscarriage of justice" review; no miscarriage of justice if appellate record shows trial court would have properly exercised discretion to deny motion].)

Putting aside the trial court's mistaken recollection about certain aspects of Raymond's testimony, her statement was still of sufficient detail to indicate it was of solid, credible value. For example, Raymond stated that Han told her that she threw the gun over a freeway wall and buried it. Detective House confirmed that there was a sound wall for the freeway by the house and construction site.

Although specifically highlighted by the trial court in denying the motion for new trial, Raymond's statement was not the only evidence on which the court did or could rely. In issuing its verdict, the trial court also specifically credited Torres's testimony and other aspects of Raymond's testimony. The trial court also presumably relied upon Orozco's statements that Figueroa admitted to killing Herrera. The dog scent evidence corroborated these statements. Moreover, Figueroa's erratic behavior the evening before the murder, his familiarity with and access to guns, combined with the fact that, close to the time Herrera left the movie theater, Figueroa was seen heading south, in the direction where Herrera's body was later found, all corroborate the court's verdict.[19]

---

[19] In ruling on the motion for new trial, the trial court stated, "we know Mr. Figueroa is handy with guns. We know he had guns, he fired guns. So we know he is handy with a weapon." Figueroa characterizes the court's use of the word "handy" to mean Figueroa had a propensity for violence, in contravention of

The trial court did not abuse its discretion in denying Figueroa's motion for new trial.

## E.    Amendments to Section 1170 Mandate Remand for Resentencing of Figueroa

During the pendency of Figueroa's appeal, the Governor signed into law Assembly Bill No. 124 (2021-2022 Reg. Sess.) and Senate Bill No. 567 (2021-2022 Reg. Sess.), effective January 1, 2022, amending section 1170.  Because the amendments are ameliorative and Figueroa's conviction is not yet final, they apply retroactively to Figueroa's sentence.  (See *In re Estrada* (1965) 63 Cal.2d 740, 744.)

Assembly Bill No. 124 and Senate Bill No. 567 amended section 1170 to create a presumption in favor of a low prison term if certain circumstances were a contributing factor in the commission of the offense.  (§ 1170, subd. (b)(6).)  These circumstances include that the defendant experienced psychological, physical, or childhood trauma; was under the age of 26 at the time of the commission of the offense; or prior to the instant offense or at the time of the commission of the offense, the defendant was a victim of intimate partner violence or human trafficking.  Subdivision (b)(7) clarifies that subdivision (b)(6) does not preclude the court from imposing a lower term even if there was no evidence of subdivision (b)(6) factors present.  (Stats. 2021, ch. 731, § 1.3; Stats. 2021, ch. 695, § 5.)

---

its prior evidentiary ruling to not consider firearm evidence for that purpose.  Read in context, it is more likely the court meant Figueroa was familiar with how to use a gun, which the court found was a permissible inference from the evidence in making its evidentiary ruling.

31

Senate Bill No. 567 also amended section 1170, subdivision (b)(1) and (2) to require a sentencing court to impose the middle term for any offense for which the statute specifies three possible terms unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Stats. 2021, ch. 731, § 1.3; § 1170, subd. (b)(1) & (2).)

The Attorney General concedes, and we agree, that the matter should be remanded for the court to hear evidence that may warrant the imposition of the low term pursuant to section 1170, subdivision (b)(6) for counts 2 and 4. Upon remand, the court may revisit its prior sentencing decisions in light of new legislation, including, but not limited to, Senate Bill No. 567. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["the 'full resentencing rule' "].)[20]

---

[20] The Attorney General argues (and Figueroa does not dispute) a clerical error in the abstract of judgment may require correction. "Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) For Figueroa's conviction of section 245, subdivision (a)(2), assault with a firearm (count 2), the court sentenced Figueroa to the high term of four years plus an additional four-year term for the section

## DISPOSITION

We reverse and remand the matter for resentencing.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED


CRANDALL, J.*


We concur:



CHANEY, J.



BENDIX, Acting P. J.

---

12022.5 allegation of personal use of a firearm.  The abstract of judgment omits the four-year term for the section 12022.5 allegation, and, thus, does not accurately reflect the oral pronouncement of judgment.

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.